## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| BRFHH SHREVEPORT, LLC | CIVIL ACTION NO. 20-142 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| WILLIS-KNIGHTON MEDICAL CENTER | MAG. JUDGE KAYLA D. MCCLUSKY |

### MEMORANDUM RULING

Before the Court is a motion to dismiss filed by the Defendant, Willis-Knighton Medical Center ("Willis-Knighton"). Record Document 20. Willis-Knighton seeks to dismiss the complaint filed by the Plaintiff, BRFHH Shreveport, LLC, which alleges, in broad terms, that Willis-Knighton committed antitrust violations by coercing LSU Health Shreveport to refuse to cooperate with BRFHH in the operations of its Shreveport hospital. As the Court concludes that the Plaintiff has failed to sufficiently allege antitrust violations in more than a nonspeculative manner, Willis-Knighton's motion to dismiss [Record Document 20] is **GRANTED**.

### Background

The Court begins by noting that this is the second antitrust civil action filed by the Plaintiff against this Defendant, the alleged violations stemming from the same acrimonious relationship that has heretofore existed between these two parties. See BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr., 05:15-cv-2057 (W.D. La.) (the "2015 case"). The allegations in the instant case concern a more recent time period than those in the 2015 case and set forth contentions regarding different antitrust activity;

nonetheless, the cases generally involve the same players competing in the same relevant market.

## I.    The Relevant Entities

LSU is a State university with a medical school component which employs physician faculty members throughout the State.  Record Document 1 at 5.  The faculty physicians treat patients, teach students, and train residents and fellows in their respective fields. Id.  LSU Health Shreveport is the medical school in Shreveport, Louisiana.  Id.

Plaintiff BRFHH, doing business as University Health Shreveport ("UHS"), operated University Health Hospital in Shreveport.  Once a state-owned and -operated charity facility, the hospital was operated by BRFHH starting in September of 2013, when LSU, whose neighboring medical school traditionally supplied physicians for UHS, and the parent entities of BRFHH signed a Cooperative Endeavor Agreement transferring hospital management authority from the State of Louisiana to BRFHH's parent entity.  See generally BRFHH Shreveport v. Willis-Knighton, 15-cv-2057, Record Document 121.  To be discussed in more detail below, the hospital run by UHS is now run by Ochsner (named Ochsner LSU), the result of UHS's sale of its hospital business to Ochsner.  Thus, the Plaintiff in this suit is no longer involved in the operations of the current hospital.  But, the alleged antitrust conduct in this case preceded that sale and ceased when Ochsner acquired the hospital.

As a result of the 2013 privatization of the hospital, UHS treated a substantial portion of the Shreveport area's indigent population and was dependent upon hospital admissions from LSU physicians.  See id. One of the underlying issues in the 2015 case

stems from the notion that in order for UHS to remain financially viable, a critical, if minority, mass of the patients treated at UHS needed to have private, commercial insurance; the higher reimbursement rates associated with commercial insurance would help offset the relatively low profitability of treating the indigent.  See id.

Defendant Willis-Knighton is a competing healthcare provider that operates four hospitals and several free-standing clinics in Shreveport and Bossier City.  See id.  Besides Willis-Knighton and UHS, a third entity, CHRISTUS Health Northern Louisiana ("Christus") also operates hospitals in the Shreveport and Bossier City area.  See id.  The allegations in the prior suit regard Willis-Knighton's predominate share of the commercially-insured healthcare market, as opposed to the much smaller shares held by UHS and Christus. See id.  Suffice it to say that UHS and Willis-Knighton were competing healthcare providers, each trying to reduce costs while increasing efficiency and profitability.

## II.    Post-Privatization

From the commencement of the privatization agreement in 2013 until October of 2018, UHS was LSU Health Shreveport's clinical partner and its teaching hospital. Record Document 1 at 6.  The UHS medical staff was limited to LSU Health Shreveport-approved physicians. Id.  UHS depended upon admissions from those faculty physicians. Id.

When UHS took over the hospital from LSU, it took on the lease of the hospital facilities from the State, which owned the buildings on campus and the assets of the hospital.  Id. at 8.  UHS alleges that when it assumed those operations, the hospital was inefficient, experiencing "extraordinarily high overtime use, an absence of productivity standards and management dashboards, and lengthy wait times at clinics."  Id.  UHS

submits that once it took over the hospital, it created a much more "effective, efficient and patient-friendly hospital."  Id.  UHS articulates several successful measures it experienced, which can be summarized as an increase in admissions, an increase in clinic and emergency room visits, improved earnings, and decreased expenses to the State of Louisiana.  Id. at 9.  According to UHS, these improvements attracted more patients to the hospital, which resulted in UHS becoming a significant competitor to Willis-Knighton. Id. at 9-10.  During this period, UHS and LSU Health Shreveport worked closely together, engaging in weekly meetings, cooperating to improve operations, and enjoying open communications between the department chairs and UHS executives.  Id. at 15.  Taking UHS's allegations as true, in response to UHS's success,

> Willis-Knighton attempted to prevent UHS' competition by implementing a plan to divert LSU Health Shreveport's commercial patients from UHS to Willis-Knighton.  Accordingly, UHS filed the 2015 Case.  Because of the 2015 Case, Willis-Knighton put its efforts to fully implement this plan on hold. However, . . . in spring of 2016, it commenced a new scheme intended to cause harm to UHS and to keep it from improving its operations and competitiveness, by coercing LSU Health Shreveport into refusing to cooperate with UHS' new initiatives to further improve the hospital and its competitiveness.   Willis-Knighton also coerced LSU into an effort to terminate the contract whereby UHS owned and operated the hospital.

Id. at 10.  That contention—that Willis-Knighton unlawfully and in violation of antitrust law, coerced LSU Health Shreveport into refusing to cooperate with UHS in the improved operations of the hospital—is the crux of the instant suit.

     A.    <u>The Financial Crisis</u>

Historically, Willis-Knighton was a major donor to LSU Health Shreveport; these donations predated the alleged antitrust conduct at the heart of this suit.  The parties agree that during the relevant timeframe, LSU Health Shreveport perceived it was facing

a significant financial crisis, with a "heightened need for additional funds."  Id. at 14. Quite simply, LSU Health Shreveport needed an influx of a large amount of money, and it required support from outside sources, lest its school accreditation, amongst other things, be placed at risk.  Id. at 22 & 26.  Willis-Knighton was aware of LSU Health Shreveport's ongoing need for money, shortfalls historically caused by State budget deficits and then more recently related to the privatization of the hospital.  The budget crisis allegedly made LSU Health Shreveport susceptible to the whims and demands of Willis-Knighton, the deep-pocket power player in the local healthcare market.

By 2015 and 2016, LSU Health Shreveport desperately needed millions of dollars. It was LSU Health Shreveport's need for continued funding that fueled the alleged antitrust conduct here.  The medical school's Vice-Chancellor Victor Yick ("Yick") authored a document conceding that LSU Health Shreveport was in a financial crisis, that it experienced an "operating loss of $40-$50M per year since privatization of the hospital," and that the "cash reserve can run out in [fiscal year] 2016-17."  Id. at 27.  Consequently, LSU Health Shreveport first approached UHS and requested $100 million in "mission support."  Id.  UHS declined.  Id.  LSU Health Shreveport then turned to Willis-Knighton, asking for a $50 million "mission support" grant.  Id.  Yick later reported that Willis-Knighton "conceptually agreed to provide working capital" to the medical school.  Id. UHS asserts this statement is evidence that "LSU Health Shreveport believed that it was acting in Willis-Knighton's interest by refusing to cooperate with . . . UHS."  Id.  The alleged lack of cooperation, as well as the inferences UHS draws from LSU Health Shreveport's actions, are discussed in greater detail below.

B.   Dr. Ghali

In early 2016, Dr. Ghali Ghali ("Dr. Ghali") was named as interim Chancellor of LSU Health Shreveport and subsequently named the permanent Chancellor.  Id. at 14 & 21. UHS insists that Willis-Knighton was instrumental in Dr. Ghali's promotion, as Dr. Ghali was otherwise unqualified for such a prominent administrative position.  Id. at 21.  Dr. Ghali was a senior partner in the Willis-Knighton Oral and Maxillofacial Surgery Institute, a member of the Willis-Knighton Physician Network, his primary clinic practice for many years was at Willis-Knighton and his income was determined in significant part by his collections, and Willis-Knighton provided Dr. Ghali's department at LSU Health Shreveport—presumably the Department of Oral and Maxillofacial Surgery—with $1 million or more annually.  Id. at 20. Dr. Ghali also allegedly used Willis-Knighton's private plane on occasion.  Id.  Thus, UHS asserts that Dr. Ghali "received substantial benefit from working for Willis-Knighton, and at its direction."  Id.  "Dr. Ghali's appointment as permanent Chancellor cemented Willis-Knighton's control over LSU Health's direction."  Id. at 22.

According to UHS, after Dr. Ghali assumed his new role, he acted essentially as Willis-Knighton's agent.   With Dr. Ghali at the helm, LSU Health Shreveport's administration ceased its cooperation with UHS. Id. at 15.  Bruce Solomon of LSU Health Shreveport required all UHS communications to go through him and also restricted LSU Health Shreveport department chairs from directly communicating with UHS.  Id.  The weekly meetings were cancelled.  Id.  And, when UHS proposed cooperative initiatives, LSU Health Shreveport refused to participate.  Id.  Its refusal, it is alleged, was entirely

against its own self-interest and must, therefore, have resulted from Willis-Knighton's coercion.  Id.

    C.    <u>Means of Coercion</u>

        1.    Allegedly Contingent Funding

UHS contends that Willis-Knighton linked its funding to LSU Health Shreveport's agreement not to cooperate with UHS.  That is, Willis-Knighton "would continue to fund LSU Health Shreveport only if LSU Health Shreveport did not support its competitors." Id. at 23.  According to UHS, Willis-Knighton wanted to eliminate UHS as the hospital operator, or at the very least, ensure UHS could not be competitive. Id.

As evidence, UHS cites to a time in 2012 when James Elrod ("Elrod"), the President and CEO of Willis-Knighton, told the Willis-Knighton Board that it would only continue its current level of funding to LSU Health Shreveport if the two entities "remain[ed] partners, not competitors." Id. at 23.  Also in 2012, there was some indication that Willis-Knighton was aware that if another hospital corporation managed LSU Health Shreveport, Willis-Knighton may encounter an adversarial relationship with LSU Health Shreveport with respect to its market share.  Id.  In 2013, at a Willis-Knighton Board meeting, Elrod said that Willis-Knighton's continued support of the medical school would continue only so long as LSU Health Shreveport did not directly compete with Willis-Knighton and if Willis-Knighton could have some level of oversight.  Id.  In 2014, Willis-Knighton drafted a letter to its employees that said that UHS would begin "seeking to draw private patients from Willis-Knighton and Christus Highland. So the LSU hospital that once was an ally is now

a competitor." Id. at 24.  All of the comments above were made prior to the antitrust activity alleged in this case.

Aside from Elrod's and Willis-Knighton's direct statements about UHS and/or the medical school, UHS also contends that Willis-Knighton had a pattern of stymying LSU Health Shreveport's efforts to work with Willis-Knighton's competitors. Id. at 25. In 2015, LSU Health Shreveport's department chairs were invited to meet with UHS and Ochsner on a possible joint venture. Id.  In testimony in the 2015 case, the LSU Health Shreveport Dean, Dr. Marymont, stated that Willis-Knighton told him that if he went forward with the meeting, Willis-Knighton would cease funding the medical school.  Id.  Dr. Marymont testified that "on other occasions," Willis-Knighton threatened to pull its funding from LSU Health Shreveport "if it was unhappy with LSU actions." Id.  The 2015 meeting predates the antitrust activity in this case, as well; and, UHS provides no temporal context for the "other occasions" mentioned by Dr. Marymont.

In 2016, Willis-Knighton gave a PowerPoint presentation to Yick that represented it was aware of the critical funding issues faced by LSU Health Shreveport and that it was willing to increase its funding of programs and services to LSU Health Shreveport if there was "increased cooperation from leadership and the faculty." Id. at 26.  Willis-Knighton also proposed a consolidation of programs and services with LSU Health Shreveport, though this never occurred.  Id.

In July of 2016, Yick authored an email to the LSU President and CFO stating that LSU Health Shreveport still needed to raise $50 million in mission support.  Id. at 29.  He stated that Willis-Knighton "is our mother lode" and that the medical school "still [has]

8

work to do with WK." Id. Yick's email further opined that LSU Health Shreveport's energy needed to be spent on rebuilding rather than collaborating with UHS and that the medical school needed to "form a sustainable long term partnership" with Willis-Knighton. Id. Yick also stated that letters of intent LSU had entered into with other hospitals, aside from Willis-Knighton, were "initially just for cover." Id. That Yick felt the need for cover is, according to UHS, proof of LSU Health Shreveport's complicity in an unlawful scheme. Id. Nonetheless, because of the 2015 case, Willis-Knighton never provided the anticipated funding to LSU Health Shreveport. Id. at 28.

Lastly, in a 2017 deposition, Elrod agreed that without Willis-Knighton, LSU Health Shreveport would have a difficult time surviving. Id. at 22.

### 2. Noncompliant Physicians

UHS contends that Willis-Knighton engaged in a pattern of threatening non-cooperative physicians. Id. at 24. In essence, the allegation seems to be that Willis-Knighton would punish physicians who made referrals to non-Willis-Knighton facilities by hiring new Willis-Knighton physicians to compete with those physicians. The new physicians would receive all of the Willis-Knighton referrals, thus creating a "starvation of referrals" to the non-compliant physicians. Id. UHS claims that Elrod communicated this threat through the publication of his book, and as such, the entire Shreveport-Bossier healthcare community was made aware of the consequences of competing against Willis-Knighton. Id. at 25.

UHS also asserts that Dr. Ghali fired Dr. Anil Nanda ("Dr. Nanda"), the "most renowned physician at LSU Health Shreveport" because Dr. Nanda "did not admit

sufficient numbers of patients at Willis-Knighton to satisfy James Elrod, and because he had always cooperated with UHS." Id. at 43-44.  Elrod allegedly told Dr. Ghali that "the best thing Dr. Ghali ever did was to fire Dr. Nanda as head of the Neurosurgery Department." Id. at 45.  The firing of Dr. Nanda is allegedly evidence of one form of retaliation Willis-Knighton had in its arsenal to use against non-compliant physicians.

     D.    Lack of Cooperation

There are myriad ways in which LSU Health Shreveport allegedly refused to cooperate with or acted to undermine UHS, including: (1) its refusal to combine fixed overhead activities to reduce costs; (2) its refusal to participate in a narrow network product with Blue Cross; (3) its refusal to improve productivity, efficiency, and quality of care in various departments; (4) its refusal to cooperate in recruitment of new physicians; (5) Dr. Ghali's dismissal of Dr. Jay Marion as Chair of the Department of Medicine and Dr. Nanda as the Chair of the Neurosurgery Department of LSU Health Shreveport; (6) Dr. Ghali's miscellaneous defamatory statements; and (7) LSU Health Shreveport's attempts in 2016 and 2017 to terminate UHS as the owner and operator of the hospital, which caused damage to UHS's reputation.  Id. at 16-19.[1]  UHS contends that LSU Health Shreveport's "conduct was inconsistent with unilateral, self-interested behavior, and can only be explained by [its] acquiescence in and agreement to Willis-Knighton's demands" because "no rational medical school would have undertaken" the actions LSU Health Shreveport did absent "coercion by Willis-Knighton." Id. at 19.

---

[1]  Not all of these issues are given equal attention in UHS's complaint.  Some are mentioned in passing and never discussed again.  As such, the Court's analysis will follow suit and focus on the issues to which UHS has given its attention.

In 2018, Ochsner bought an interest in both the Shreveport and Monroe[2] hospitals and created Ochsner LSU.  Id. at 48.  As a result, LSU Health Shreveport received an additional $40 million annually, plus a fifty percent stake in the hospital.  Id.  Allegedly, LSU Health Shreveport now cooperates in initiatives with Ochsner in ways it refused to cooperate with UHS.  Id. at 49.  This is so, UHS asserts, because LSU Health Shreveport is no longer susceptible to Willis-Knighton's coercion.  Id.

### III.   The Instant Suit

In 2020, UHS brought this suit, alleging that between 2016 and 2018, Willis-Knighton violated both Section 1 of the Sherman Act, which prohibits concerted activity relating to unreasonable restraints of trade, 15 U.S.C. § 1; and Section 2 of the Sherman Act, which prohibits monopolization and attempted monopolization, 15 U.S.C. § 2.  UHS did not name LSU Health Shreveport as a defendant in this matter.

Willis-Knighton has filed the instant motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  It argues that there are five principal reasons to dismiss UHS's claims.  First, UHS has not established antitrust injury, a threshold requirement for a plaintiff in any antitrust claim.  Record Document 20-1 at 11.  Second, UHS has not sufficiently alleged an agreement or conspiracy between LSU Health Shreveport and Willis-Knighton, for purposes of Section 1 of the Sherman Act.  Id. at 14.  Third, UHS has not alleged the requisite anticompetitive conduct, that is exclusionary conduct, to sustain its claim under Section 2 of the Sherman Act.  Id. at 17.  Fourth, the First Amendment shields Willis-Knighton's actions from antitrust liability under the Noerr-Pennington

---

[2] University Hospital Conway was located in Monroe, Louisiana.

Doctrine.[3]  Id. at 21.   And fifth, Willis-Knighton is shielded from liability by the State

Action Doctrine.  Id. at 28.   Following extensive briefing by the parties, the matter is now

ripe for review.

**Law and Analysis**

## I.        Federal Rule of Civil Procedure 12(b)(6) Standard

Federal Rule of Civil Procedure 8 requires a short and plain statement of the claim

showing the pleader is entitled to relief.  A complaint is not required to contain detailed

factual allegations, however, "a plaintiff's obligation to provide the grounds of his

entitle[ment] to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555 (2007) (internal marks and citations omitted).   "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2008) (internal

marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Id.  Plausibility does not equate to possibility or probability; it lies

somewhere in between.  See id.  This plausibility requirement "asks for more than a sheer

possibility that a defendant has acted unlawfully."  Id.  However, the complaint cannot

be   simply   "unadorned,   the-defendant-unlawfully-harmed-me   accusation[s]."   Id.

Plausibility simply calls for enough factual allegations to raise a reasonable expectation

---

[3]  E. R.R. Presidents Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961); United Mine
Workers of Am. v. Pennington, 381 U.S. 657 (1965).

that discovery will reveal evidence to support the elements of the claim.  See Twombly, 550 U.S. at 555-56.

As the Fifth Circuit has explained, in order to survive a 12(b)(6) motion, "the complaint must contain either direct allegations on every material point necessary to sustain a recovery or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." Rios v. City of Del Rio, Tex., 444 F.3d 417, 420–21 (5th Cir. 2006) (internal marks and citation omitted). Moreover,

> a statement of facts that merely creates a suspicion that the pleader might have a right of action is insufficient. Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. The court is not required to conjure up unpled allegations or construe elaborately arcane scripts to save a complaint.   Further, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.

Id. at 421 (internal marks and citations omitted).

Although courts generally are not permitted to review materials outside of the pleadings when determining whether a plaintiff has stated a claim for which relief may be granted, there are limited exceptions to this rule. Specifically, a court may consider documents attached to a Rule 12(b)(6) motion to be part of the pleadings if the plaintiff refers to those documents and they are central to the claim. See Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000); Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004). Additionally, pleadings filed in state or other federal district courts are matters of public record and the Court may take judicial notice

of those documents in connection with a Rule 12(b)(6) motion to dismiss. See Cinel v. Connick, 15 F.3d 1338, 1343 (5th Cir. 1994).

## II.    Antitrust Injury

Willis-Knighton argues that UHS has not sufficiently alleged antitrust injury. Antitrust injury is necessary for a plaintiff to pursue either a Section 1 or Section 2 claim under the Sherman Act.  Jebaco, Inc. v. Harrah's Operating Co., 587 F.3d 314, 319 (5th Cir. 2009).  Antitrust injury is a component of antitrust standing.  Antitrust standing, in turn, is a judicially-created set of threshold requirements that a private plaintiff must show before a court can entertain its antitrust claims.  See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC"), 459 U.S. 519, 535 & n.31 (1983). The three antitrust standing requirements are "1) injury-in-fact, [i.e.,] an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." Sanger Ins. Agency v. HUB Int'l, Ltd., 802 F.3d 732, 737 (5th Cir. 2015) (citing Jebaco, 587 F.3d at 318). These requirements, which supplement Article III standing requirements, ensure that successful antitrust claims only redress the types of harm that antitrust law was designed to prevent, rather than create a fortuitous windfall for all parties proximate to the defendant, regardless of whether they were injured by anticompetitive conduct.  See AGC, 459 U.S. at 535.

The second component of antitrust standing, antitrust injury, requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful."  Brunswick Corp. v. Pueblo Bowl-O-

Mat, Inc., 429 U.S. 477, 489 (1977).   This means that in an antitrust suit, but-for causation is insufficient.   Instead, a plaintiff must be able to trace its injury to the anticompetitive effects of the defendant's antitrust violation.   See id.   Thus, an inquiry into antitrust injury always asks whether there is a causal connection between the alleged injury of the plaintiff and the anticipated anticompetitive effect of the specific practice that allegedly violates antitrust law.   See Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 122 (2d Cir. 2007) ("We can ascertain antitrust injury only by identifying the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges.").

UHS contends that Willis-Knighton's unlawful conspiracy targeted UHS's business in order to stymie competition and increase its monopoly power in the relevant market. Taking UHS's allegations as true, as a result of Willis-Knighton's anticompetitive scheme, UHS was not prevented from working with LSU Health Shreveport on pre-established initiatives and programs, but rather it was restrained from improving and becoming more competitive in other areas and on other healthcare measures.   Stated another way, Willis-Knighton's anticompetitive intention was to restrict UHS's ability to compete with it, which could have resulted in diminishing Willis-Knighton's predominance in the local healthcare market.   Consequently, UHS alleges, Willis-Knighton restrained competition by hindering UHS's ability to work with its physicians on measures which ultimately would have decreased costs, improved quality of care, or ensured and/or increased access to care.[4]

---

[4] Many of the areas in which UHS claims LSU Health Shreveport refused to cooperate are insufficient for purposes of establishing antitrust injury.  For example, the litany of ways in which the two entities could have shared costs, coordinated on a drug

So viewed, UHS's competitive disadvantage "fall[s] within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc., 123 F.3d 301, 305 (5th Cir. 1997) (finding antitrust injury, for purposes of standing, was aptly demonstrated by plaintiff, a direct competitor of the alleged monopolist who colluded with a third party to remove plaintiff from the relevant market and weaken its competitive state).   Therefore, the Court finds that UHS has sufficiently alleged antitrust injury for standing purposes.

### III.   Section 1 of the Sherman Act

Title 15, United States Code, Section 1 prohibits any contract, combination, or conspiracy that unreasonably restrains trade.   Over a century of Supreme Court interpretation of Section 1 has distilled its expansive definition into a number of well-recognized causes of action, such as vertical and horizontal price fixing, tying agreements, and exclusive dealing agreements.   Holmes and Mangiaracina, Antitrust Law Handbook § 2.2.   Here, UHS's complaint does not coherently describe one of the more familiar

---

formulary, or established an outpatient imaging center, allegedly would have decreased costs or increased profitability.  For these, there is no suggestion that they would have harmed, or in the converse, helped patients or the consumer market.  The Court will not consider those allegations for purposes of assessing whether UHS has alleged an antitrust injury, as the antitrust laws protect competition, not the competitor.  Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993). The Court is concerned with harm to UHS only insofar as that harm resulted in a concomitant effect upon consumer costs, the quality of care, access to care, and patient choice.  With that in mind, the Court deems sufficient the allegations regarding the narrow insurance network, co-management of certain departments, improvements upon physician productivity, recruitment of or privileges to new physicians, staffing of clinics, Dr. Nanda's termination, and improved clinical documentation.

antitrust allegations, however, its opposition to the motion to dismiss clarifies that it has alleged an unlawful vertical integration.

There are three elements of a Section 1 claim: (1) a conspiracy; (2) that restrained trade; (3) in the relevant market.  Golden Bridge Tech., Inc. v. Motorola, Inc., 547 F.3d 266, 271 (5th Cir. 2008).  "Antitrust claims do not necessitate a higher pleading standard and a plaintiff need only plead enough facts to state a claim to relief that is plausible on its face."  Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n, 751 F.3d 368, 373 (5th Cir. 2014) (internal marks omitted).   Only the sufficiency of the first element—conspiracy—was challenged by Willis-Knighton's motion to dismiss.[5]

---

[5] Although they are not at issue in this opinion, the Fifth Circuit has set forth the analysis for the other elements:

> Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the *per se* rule or the rule of reason. The *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason. Moreover, the *per se* rule should only be applied when conduct is so pernicious and devoid of redeeming virtue that it is condemned without inquiry into the effect on the market in the particular case at hand.

> Under a rule of reason analysis, the factfinder considers all of the circumstances to determine whether a restrictive practice imposes an unreasonable restraint on competition. The court's considerations should include the restrictive practice's history, nature, and effect and whether the businesses involved have market power. Market power has been defined as the ability to raise prices above those that would be charged in a competitive market. The rule of reason analysis also requires that the plaintiff show that the defendants' activities injured competition. The rule of reason is designed to help courts differentiate between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest. Regardless of which rule applies, the court's inquiry should ultimately focus upon forming a judgment about the competitive significance of the restraint.

A.    <u>Conspiracy</u>

Willis-Knighton submits that UHS has failed to sufficiently plead a conspiracy between it and LSU Health Shreveport under Section 1 of the Sherman Act.  In response, UHS argues that it has adequately alleged that Willis-Knighton threatened LSU Health Shreveport into unlawfully restraining UHS's ability to compete by making Willis-Knighton's monetary contributions contingent upon LSU Health Shreveport's accession to its demands.  The Court disagrees.

"Section 1 of the Sherman Act does not proscribe independent conduct." <u>Viazis v. Am. Ass'n of Orthodontists</u>, 314 F.3d 758, 761 (5th Cir. 2002) (citing <u>Monsanto Co. v. Spray–Rite Serv. Corp.</u>, 465 U.S. 752, 761 (1984)).  Thus, a Section 1 violation requires concerted action.  To be sure, "[t]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." <u>Twombly</u>, 550 U.S. at 553 (internal marks omitted).

To satisfy this inquiry in the present case, UHS must show that Willis-Knighton "engaged in concerted action, defined as having a 'conscious commitment to a common scheme designed to achieve an unlawful objective.' " <u>Golden Bridge Tech.</u>, 547 F.3d at 271 (quoting <u>Monsanto</u>, 465 U.S. at 764).  Under <u>Twombly</u>, to successfully plead a Section 1 claim, the complaint must assert sufficient facts to suggest an agreement was made; that is, enough factual matter "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." <u>Twombly</u>, 550 U.S. at 556.  Parallel business behavior, <u>i.e.</u>, parallelism, does not constitute a conspiracy, nor does a "conclusory allegation of

<u>Marucci Sports</u>, 751 F.3d at 374 (cleaned up).

agreement at some unidentified point . . . supply facts adequate to show illegality." Id.

at 556-57.  A plaintiff's allegations must plausibly suggest the unlawful agreement, not

simply be consistent with an agreement.  Id. at 557.  Without context showing "a meeting

of the minds," the defendant's conduct remains "in neutral territory."  Id.

As a preliminary matter, per the instructions of Iqbal and Twombly, this Court must

disregard the complaint's conclusory and formulaic assertions, as those are not entitled

to a presumption of truth.   The remaining allegations must then be examined to

determine whether they plausibly suggest entitlement to relief.  As the district court

explained in Dowdy & Dowdy Partnership v. Arbitron, Inc.,:

> A "bare allegation of conspiracy" and "a conclusory allegation of agreement
> at some unidentified point" are insufficient to plead illegal antitrust activity.
> Not only does the naked allegation of a conspiracy, without additional facts,
> not state a plausible antitrust claim, such conclusory allegations are not
> entitled to be accepted as true for the purposes of this motion.

Dowdy & Dowdy P'ship v. Arbitron Inc., No. 2:09CV253 KS-MTP, 2010 WL 3942755, at

*3 (S.D. Miss. Oct. 6, 2010) (internal citations omitted).

Here, although the complaint repeatedly uses the term "threat," what actually

constitutes a threat seems to be a more complicated question than UHS has recognized.

Within the context of the case and in light of the way in which the complaint was drafted,

the Court finds the use of the term "threat" is a legal conclusion masquerading as a fact.

Other problematic areas within the complaint include UHS's allegation that Willis-Knighton

threatened to pull its existing financial support if LSU Health Shreveport refused to

participate in Willis-Knighton's "scheme" to harm UHS.  Record Document 1 at 14.

Disregarding the use of the term threat, the allegation is still in peril, as it relies broadly

19

on the existence of a scheme, when one is never sufficiently alleged.  UHS also generally alleges that Willis-Knighton made "promises to provide [and] threats to withhold funds based on LSU's acquiescence in its demands . . . ."  Id. at 22.  Again, however, the so-called "demands" are never described in terms that are nonconclusory or nonspeculative.  These allegations will not be given the presumption of truth.

The Court has examined UHS's actual factual allegations to determine whether they plausibly state a claim under Section 1 of the Sherman Act.  Despite spanning seventy-six pages, the complaint is lacking in detail.  "A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail."  Southland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 362 (5th Cir. 2004) (quoting Williams v. WMX Techs., Inc., 112 F.3d 175, 178 (5th Cir. 1997)).  UHS's claims of antitrust conspiracy rest on four bases:

> (1) Elrod's involvement: (a) his 2012 statement to the Willis-Knighton Board that it would continue to fund LSU Health Shreveport so long as the two entities remained partners, not competitors; (b) his 2013 comment at a Willis-Knighton Board meeting that Willis-Knighton would continue to support the medical school so long as LSU Health Shreveport's business model was not in direct competition with Willis-Knighton and Willis-Knighton could have some oversight; and (c) his 2017 deposition testimony in which he agreed that the medical school would have a difficult time surviving without Willis-Knighton;
>
> (2) Yick's involvement:  (a) Willis-Knighton's 2016 PowerPoint presentation to Yick that represented it was willing to increase its funding of programs and services to LSU Health Shreveport if there was "increased cooperation from leadership and the faculty"; (b) Yick's 2016 email stating that LSU Health Shreveport still needed to raise $50 million in mission support, that Willis-Knighton "is our mother lode," and his opinion that LSU Health Shreveport's energy needed to be spent on rebuilding rather than collaborating with UHS; (c) his report that Willis-Knighton had "conceptually agreed to provide working capital" to the medical school; and (d) his

statement that letters of intent into which LSU had entered with other hospitals, aside from Willis-Knighton, were "initially just for cover";

(3) Willis-Knighton's referral shortage; and

(4) LSU Health Shreveport's refusals to cooperate with UHS, including Dr. Ghali's statement that he did not enter into a narrow insurance network with Blue Cross because it would have angered Elrod.

As these bases are interdependent, the Court's analysis must view them jointly to determine whether UHS has alleged a plausible Section 1 claim.[6]  The Court finds that all of UHS's factual allegations suffer from the same deficit:  UHS has not pleaded sufficient facts to suggest a prior agreement existed between Willis-Knighton and LSU Health Shreveport to unreasonably restrain trade of medical services.  "[R]esisting competition is routine market conduct."  Twombly, 550 U.S. at 566.  As the Supreme Court has explained, when examining a Section 1 claim, "[c]ircumstances must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.' "  Monsanto, 465 U.S. at 764 (quoting Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)).  Thus, the Court must determine whether there is concerted

---

[6] While the Court has not tightly compartmentalized each set of allegations, analyzed them independently, and wiped the slate clean after each examination, it does note that the Fifth Circuit has expressed doubt as to whether instances of alleged conduct, which individually are not anticompetitive, can be aggregated to be considered cumulatively anticompetitive.  Retractable Techs., Inc. v. Becton Dickinson & Co., 842 F.3d 883, 892 (5th Cir. 2016) (citing with approval City of Groton v. Conn. Light & Power, 662 F.2d 921, 928 (2d Cir. 1981) (holding alleged instances of misconduct, none of which is anticompetitive, cannot be cumulatively anticompetitive.)).  The Retractable Technologies opinion explained that there has been no case since its 1980 decision in Associated Radio Services Co. v. Page Airways, Inc., 624 F.2d 1342, 1356 (5th Cir. 1980), in which "a congeries of business torts was found so egregious as to constitute actionable predatory or exclusionary conduct."  Id.  Nonetheless, in the instant case, the Court's antitrust analysis has been as coterminous as UHS's complaint and the law allow.

action, and if so, whether that concerted action was the result of a meeting of the minds to agree to restrain competition.  See Marucci Sports, 751 F.3d at 375 (instructing that the "pivotal question is whether the concerted action was a result of an agreement  . . . to unreasonably restrain trade.").

Here, the complaint does not allege facts demonstrating an intention on the part of LSU Health Shreveport to engage in a conspiracy.  See id. at 378-79 (complaint dismissed because plaintiff failed to set forth facts showing a meeting of the minds or any actual agreement among the conspirators).  As to the statements made by Elrod to the Willis-Knighton Board in 2012 and 2013, these two statements were made three and four years prior to the alleged antitrust activity in this case.  Further, Elrod's comments were made to his own Board, not to LSU Health Shreveport.  UHS has not alleged that the statements were ever communicated to LSU Health Shreveport or that LSU Health Shreveport ever learned of them.  There is no suggestion that these statements were repeated at a time more contemporaneous with the alleged conspiracy.  These statements do not plausibly suggest a conspiracy.

Nonetheless, using the 2016 PowerPoint presentation to Yick, UHS makes inferential leaps to connect Elrod's historical statements to Yick's more contemporaneous comments, thereby deducing a conspiratorial link exists.  However, Yick's statements, even when viewed against the backdrop colorfully painted by UHS, still do not plausibly suggest a conspiracy to restrain competition.

UHS argues LSU Health Shreveport was desperate for money and that, in exchange for the money it so badly needed, Willis-Knighton required LSU Health Shreveport to

accede to its unlawful, anticompetitive whims by halting UHS's competitive momentum. UHS, however, cannot survive Rule 12(b)(6) scrutiny simply by supplanting its subjective beliefs for facts.  There is a paucity of facts to entitle UHS to the inferences upon which its claims are premised.  The complaint is silent as to (1) when, where, or how the conspiracy was formed; (2) whether Willis-Knighton communicated with LSU Health Shreveport about the conspiracy; (3) whether LSU Health Shreveport communicated with Willis-Knighton about the conspiracy; and (4) whether they shared a common intent or meeting of the minds to restrain trade.

UHS points out that it is not required to set forth a "specific time, place, or person" for its conspiracy allegations.  See In re Pool Prod. Distrib. Mkt. Antitrust Litig., 988 F. Supp. 2d 696, 715 (E.D. La. 2013).  It is, however, required to "allege the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible."  Id.  Like the district court in Pool Products, the Court here is unable to infer the "general contours of when the alleged agreement was made or even what, precisely, the agreement was."  Id. at 719.  That is, the Court cannot discern what the agreement was or when it was confected; there is no description of how or under what terms the agreement was reached, nor is there a mention of the extent of the agreement.  See id. at 721 (noting that "[s]uch vague conspiracy claims rarely pass muster under Rule 8 and Twombly") (collecting cases).  UHS also argues that it does not need to establish that LSU Health Shreveport communicated with Willis-Knighton on each of its decisions, as LSU Health Shreveport was aware of the overall threat.  While it is true that an express agreement on every detail is not required, it is

23

equally true that the law demands more than what is alleged here.  There still must be an agreement to a scheme and an agreement to work together to further a common goal. UHS's complaint has failed to satisfy that standard.

As to the alleged starvation of referrals used by Willis-Knighton to threaten non-compliant physicians, UHS claims this "threat" was contained within Elrod's book, which was generally available to those in the relevant healthcare market who wanted to read it.[7]   The allegation itself lacks context and contour.  Even if the book was generally available in the marketplace, UHS alleges no fact from which to infer that LSU Health Shreveport, as an entity, knew of Elrod's statements, knew of the practice generally, felt threatened by it, and felt threatened enough to engage in a conspiracy.  Without additional factual context, this allegation is too specious to withstand scrutiny.

As to Elrod's 2017 deposition testimony, his statement does not demonstrate any conspiracy or agreement between Willis-Knighton and LSU Health Shreveport. It is a factual statement, not wholly untrue, provided in a vacuum without any surrounding context.  Even when viewed in light of UHS's other allegations, it fails to demonstrate any meeting of the minds or agreement to coerce LSU Health Shreveport into refusing cooperation with UHS.

---

[7] The Court notes that in the 2015 case, it concluded that Willis-Knighton's control of physician referrals was not anticompetitive under Section 2 of the Sherman Act because it did not lack competition on the merits.  BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr., 176 F. Supp. 3d 606, 625–26 (W.D. La. 2016). That is, the practice had a rational business purpose (treatment of more patients) and Willis-Knighton could not have accomplished the acts without the consent and participation of consumers.  Id. at 625.

Finally, UHS argues that LSU Health Shreveport's refusals to cooperate are each discrete overt acts taken in furtherance of the conspiracy.  UHS contends that Dr. Ghali's statement—that entering into a narrow insurance network with Blue Cross would have angered Elrod—is evidence of an overt act taken in furtherance of the conspiracy.  An overt act is an act taken in furtherance of a conspiracy only so long as there is, in fact, a conspiracy in existence; otherwise, the act is just an act.  Again, UHS has used a broad brush to paint all unfavorable decisions as ones caused by a conspiracy against it.  To the contrary, broad brushes and generalized theories of long-standing coercion cannot withstand Rule 12(b)(6) scrutiny.

UHS insists the only reason LSU Health Shreveport would decline its opportunities is if it was coerced by Willis-Knighton because, according to UHS, the decisions were against LSU Health Shreveport's best interests.  UHS's case can be summed up thusly— there must have been an unlawful agreement to conspire against and harm UHS because UHS cannot otherwise understand why LSU Health Shreveport would not have jumped at the chance to implement all of UHS's good ideas.  Yet, LSU Health Shreveport was entitled to decline business endeavors that would jeopardize its relationship with a donor without running afoul of antitrust laws.  Indeed, "one might refrain from taking an otherwise profitable step because someone else has the power to make it unacceptably costly . . . such inaction serves the decisionmaker's long-run interest, taking the third party's power into account."  In re Pool Prod. Distrib. Mkt. Antitrust Litig., 988 F. Supp. 2d at 718 (quoting 6 Phillip Areeda & Herbert Hovencamp, Antitrust Law ⁋ 1415c (3d ed. 2010)).  These allegations, without more, fall short of establishing a conspiracy between Willis-

Knighton and LSU Health Shreveport, in which both entities agreed to work together to restrain UHS's ability to compete in the marketplace.

The gravamen of UHS's case is that Willis-Knighton threatened LSU Health Shreveport, LSU Health Shreveport felt threatened and thus agreed to Willis-Knighton's demands, and LSU Health Shreveport refused to cooperate with UHS.   Unfortunately, UHS has committed a logical fallacy by (1) observing past behavior by Willis-Knighton, (2) observing a current unfavorable situation with LSU Health Shreveport, and (3) deducing that LSU Health Shreveport's behavior must have been caused by Willis-Knighton.   Put in the familiar A + B = C equation, with "A" being Willis-Knighton's "ruthless" competition and "C" being LSU Health Shreveport's rejection of additional joint endeavors, UHS's complaint is missing "B"—that is, the other element that plausibly supports the inference that Willis-Knighton *caused* LSU Health Shreveport's behavior. Under <u>Monsanto</u>, there must be a meeting of the minds.  The Supreme Court has defined that as something more than mere acquiescence.  "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." <u>Monsanto</u>, 465 U.S. at 761.  The manufacturer can announce its decision in advance and "refuse to deal with those who fail to comply." <u>Id.</u>  The downstream entity "is free to acquiesce" in the demand "in order to avoid termination." <u>Id.</u>   A conspiracy requires "more than a showing that the distributor conformed . . . . It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." <u>Monsanto</u>, 465 U.S. at 764 n.9.

UHS is required to sufficiently plead an agreement, a meeting of the minds. "Absent any agreement, there is no Section 1 claim, because an anticompetitive agreement is the *sine qua non* of a Section 1 violation." In re Pool Prod. Distrib. Mkt. Antitrust Litig., 988 F. Supp. 2d at 708.   Here, what led to LSU Health Shreveport's decision not to engage in additional joint endeavors is sheer speculation.   There are insufficient allegations to plausibly suggest that Willis-Knighton actually threatened LSU Health Shreveport and, there is even less to suggest that LSU Health Shreveport entered into an unlawful conspiracy with Willis-Knighton to comply with its demands.

In sum, notably absent from UHS's complaint is the critical linkage between Willis-Knighton and LSU Health Shreveport, in terms of communications, timing, intent, and conduct.   Like Twombly, UHS's complaint is rife with "legal conclusions resting on the prior allegations." Twombly, 550 U.S. at 564.  UHS argues that it is entitled to reasonable inferences, which ostensibly should result in a plausible showing of a conspiracy to restrain competition.   However, a plaintiff must first allege a fact from which the inferential leap can be made.  An inference cannot exist without the underlying premise. In the law, these premises must take the form of nonspeculative allegations of fact. Without those, no reasonable inferences may be drawn at all.  See Marucci Sports, 751 F.3d at 375 (explaining that when the complaint "presents various conclusory allegations that support one of many inferential possibilities," it falls short of Twombly's pleading standards.).   The Court finds that UHS has failed to sufficiently plead a claim under Section 1 of the Sherman Act, and therefore this claim shall be dismissed with prejudice.

**IV.   Section 2 of the Sherman Act**

Section 2 of the Sherman Act prohibits the monopolization or attempted monopolization of any trade or commerce.[8]   15 U.S.C. § 2.   In contrast to Section 1, Section 2 of the Sherman Act "covers both concerted and independent action, but only if that action monopolizes or threatens actual monopolization, a category that is narrower than restraint of trade." Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 190 (2010) (internal citations and quotations omitted).   A defendant is liable for monopolization under Section 2 when it (1) possesses monopoly power[9] and (2) achieves or maintains its monopoly power through anticompetitive conduct.  See 15 U.S.C. § 2; Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, 540 U.S. 398, 407-08 (2004); Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 522 (5th Cir. 1999) (the monopolist must have "acquired or maintained that power wilfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident.") (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).

---

[8] UHS has alleged both monopolization and attempted monopolization in violation of Section 2. These claims are indistinguishable for the purposes of evaluating Willis-Knighton's dismissal arguments. Because anticompetitive conduct is an element of both, Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993), the viability of either claim is dependent upon UHS's ability to sufficiently plead anticompetitive conduct.

[9] To establish Section 2 violations asserting monopolization, a plaintiff must define the relevant market.  Doctor's Hosp., 123 F.3d at 311.  The Court assumes for present purposes that the healthcare market in the Shreveport-Bossier City area is a relevant antitrust market.

A.    Anticompetitive Conduct

As to the first element, Willis-Knighton's pleadings do not address, and thus do not challenge, whether it possesses monopoly power.   As such, this Court will assume arguendo that UHS has successfully alleged facts demonstrating that Willis-Knighton possesses monopoly power.

Willis-Knighton instead focuses on the second element, arguing that UHS's complaint has failed to sufficiently plead anticompetitive conduct.   The necessity of proving anticompetitive conduct, in addition to monopoly power, reflects federal courts' judgment that in the short term, the monopolist's ability to charge above-market prices invites more, rather than less, competition.   Trinko, 540 U.S. at 407 ("The opportunity to charge monopoly prices . . . induces risk taking that produces innovation and economic growth.").   Thus, while the definition of anticompetitive conduct[10] has many accepted permutations, the essence of the conduct that it makes actionable is the achievement or maintenance of monopoly power by means other than competition on the merits.   See Stearns Airport Equip., 170 F.3d at 522 (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985) ("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as [anticompetitive].")); see also United States v. Microsoft Corp., 253 F.3d 34, 58–59 (D.C. Cir. 2001) (to be condemned as anticompetitive under Section 2, the conduct "must harm the competitive process and thereby harm consumers.").   In the Fifth Circuit, proving anticompetitive

---

[10] Courts also label anticompetitive conduct exclusionary conduct, predatory conduct, and improper conduct.   See Taylor Pub. Co. v. Jostens, Inc., 216 F.3d 465, 475 n.2 (5th Cir. 2000) ("We use the terms 'predatory' and 'exclusionary' interchangeably . . . .").

conduct also "[g]enerally" requires "some sign that the monopolist engaged in behavior that—examined without reference to its effects on competitors—is economically irrational." Stearns Airport Equip. Co., 170 F.3d at 523.   Hence, UHS must allege exclusionary conduct to survive the instant motion.   Under Twombly, UHS's complaint must plead facts that, when viewed together, make anticompetitive conduct plausible. See Twombly, 550 U.S. at 555; Assoc. Radio Serv. Co., 624 F.2d at 1356.

The key factor in the inquiry is "the proffered business justification for the act. If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." Clean Water Opportunities, Inc. v. Willamette Valley Co., 759 F. App'x 244, 248 (5th Cir. 2019) (quoting Stearns Airport Equip. Co., 170 F.3d at 522).    Nonetheless, as the Fifth Circuit has cautioned, "not all unfair conduct—even by a monopolist and a fortiori by one who is not—fits within the prohibition of § 2. Conduct must not only be inconsistent with competition on the merits, it must also have the potential for making a significant contribution to monopoly power." Taylor Pub. Co., 216 F.3d at 475–76 (quoting 3A Areeda & Hovencamp ¶806d, at 331).   The rationality of the defendant's business decision is a significant, yet not dispositive, factor in ascertaining whether conduct is exclusionary.    Clean Water Opportunities, 759 F. App'x 248.  Under Stearns, courts are also to consider whether the exclusionary conduct required the active approval of the consumer or whether there was the potential existence of bribery or threats that tainted an otherwise independent business decision.  See Stearns Airport Equip., 170 F.3d at 524–27.

In the instant case, UHS's efforts to allege anticompetitive conduct under Section 2 fall short for the same reason its Section 1 claim failed.  In short, its claim hinges on speculation and subjective beliefs, not facts and the reasonable inferences to be drawn therefrom.  Setting aside UHS's bare allegations, legal conclusions, and speculation, the lack of actual facts in the complaint makes it nearly impossible to define what Willis-Knighton even did that is deemed exclusionary.  Several years before the antitrust violations allegedly occurred, Willis-Knighton told its Board members that it would not fund a competitor.  Three to four years later, Yick stated that Willis-Knighton conceptually agreed to provide the hospital with funding.  Prior to and during this time was the pervasive, long-term threat of a referral starvation.  Despite these allegations, the complaint fails to enunciate or describe any acts taken by Willis-Knighton that this Court could use to dissect whether Willis-Knighton acted anticompetitively, or rather, whether this was just business—unfair, tortious, or otherwise.  There is, in fact, a great distinction between antitrust activity and victorious, if unrelenting, business practices.[11]  Indeed, "[c]ompetition, even the maintenance of monopoly, through superior business acumen is allowed under section 2."  Stearns Airport Equip., 170 F.3d at 527.

---

[11] As the Fifth Circuit instructed, the "distinction between unfair conduct and anticompetitive conduct is critical to maintain because the antitrust laws 'do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.' " Retractable Techs., 842 F.3d at 892–93 (quoting Brooke Grp. Ltd., 509 U.S. at 225) (internal marks omitted). The Supreme Court has stressed that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." Brooke Grp., 509 U.S. at 225.

UHS argues that Willis-Knighton's insistence or demand that LSU Health Shreveport's "medical staff not cooperate with the hospital with which it primarily works" cannot be deemed competition on the merits for antitrust purposes.  In doing so, it repeats its familiar refrain that Willis-Knighton's actions were designed to limit UHS's competitive abilities.  Nonetheless, reurging a conclusory allegation, without more, does not make the allegation plausible.  The pleading woes that plagued UHS's Section 1 claim similarly doom its Section 2 claim.   UHS's theories are dependent upon a sufficient showing of a threat, or coercion, or even an insistence, all of which lack a plausible showing in the complaint.

Even assuming UHS had sufficiently pleaded a threat or demand regarding Willis-Knighton's donations, Willis-Knighton contends that its business decisions are not anticompetitive.  That is, any business would refrain from donating to another if the donee intended to help a competitor harm the donor.  UHS counters that "when that 'harm' is simple competition, an action taken to preclude it is classic exclusionary conduct."  Record Document 27 at 26. The distinction UHS fails to account for is that an action *taken* to *prevent* competition is different than an action *not taken* because it would *assist* or subsidize the competition.  Despite many statements implying the contrary, UHS eventually concedes that the antitrust laws do not require Willis-Knighton to subsidize its own competition.  Id. at 29. Nonetheless, UHS avers that an "antitrust violation arose when Willis-Knighton indicated that it would only provide funds *contingent* on *anticompetitive* actions."  Id. (emphasis in original).  But here again, the complaint lacks sufficient allegations to plausibly suggest both the contingent nature of the funding, as

32

well as the anticompetitive actions Willis-Knighton allegedly took.  The complaint fails to contain the requisite material to nudge UHS's claim over the line from conceivable to plausible as demanded by <u>Twombly</u>.  For these reasons, the Court concludes that UHS's complaint has failed to sufficiently allege anticompetitive conduct, and thus its claim under Section 2 of the Sherman Act must fail.   This claim shall be dismissed with prejudice.

## V.    Immunity Arguments

Willis-Knighton has also challenged UHS's complaint on immunity grounds, arguing the shield of both the <u>Noerr-Pennington</u> Doctrine as well as the State Action Doctrine. Because the Court finds both Section 1 and Section 2 claims were insufficiently pleaded and cannot survive the motion to dismiss, it need not address Willis-Knighton's remaining contentions.

## Conclusion

The Court does not render its decision today based on a disbelief or skepticism of UHS's allegations.  Indeed, Rule 12(b)(6) does not countenance such a dismissal on those grounds.   Rather, taking the factual allegations as true and making all reasonable inferences in favor of UHS, the Court is nonetheless constrained to find that the complaint has failed to plausibly state a claim for relief.  For these reasons, Willis-Knighton's motion to dismiss [Record Document 20] is hereby **GRANTED**.  UHS's antitrust violations against Willis-Knighton are **dismissed with prejudice**.

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

   **THUS DONE AND SIGNED** this 27th day of September, 2021.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE